IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEVIN QUINN, et al.,                       :

    Plaintiffs,                        :

v.                                         :
                         Civil Action No. GLR-14-3529

THE BOARD OF COUNTY                        :
COMMISSIONERS FOR QUEEN ANNE'S
COUNTY, MARYLAND, et al.,                  :

    Defendants.                        :

## MEMORANDUM OPINION

Pending before the Court are Defendants', the Board of County Commissioners for Queen Anne's County, Maryland, ("Commissioners") and the Queen Anne's County Sanitary Commission ("Sanitary Commission" – collectively, the "County"), Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 13) and Defendants', the Maryland Department of Environment ("MDE") and Robert Summers, in his official capacity as Secretary of the MDE (collectively "MDE"), Motion to Dismiss Count IV of the Complaint (ECF No. 14). Having reviewed the pleadings and supporting documents, the Court finds no hearing necessary. See Local Rule 105.6 (D.Md. 2014). For the reasons outlined below, the Motions will be granted.

### I. BACKGROUND

Queen Anne's County is a political subdivision of the State of Maryland. It is governed by the Commissioners, who have —

among other police powers to protect the public health, safety, and welfare — the power to regulate land use in unincorporated communities such as South Kent Island. The Sanitary Commission is the public authority created pursuant to Md. Code Ann., Envir. § 9-607 (West 2015) to "exercise[] public and essential government functions, for the public health and welfare." The sanitary district consisting of Queen Anne's County (the "Sanitary District") is under the jurisdiction and control of the County Commissioners, who sit as the Sanitary Commission. Queen Anne's County Code §§ 24-1, 24-4.

The opening of the initial span of the Chesapeake Bay Bridge brought with it widespread residential development on South Kent Island, an area with abundant waterfront, prior to Queen Anne's County's adoption of zoning and subdivision regulations. Developers were able to create thousands of small lots simply by recording a plat among the land records. Most residential lots platted during that time were relatively small, and all of the developed lots exclusively rely on wells and septic systems. It became clear over time, however, that the land is unsuited for intense residential development that relies on septic systems.

Environmental and practical concerns related to and arising from the Chesapeake Bay watershed shape the County's regulation of land use and administration of the Sanitary District, particularly in the South Kent Island area. This area is low-lying, and has a high water table and poor soil for disposing of sewage in septic

systems.   At least eighty percent of the septic systems in two South Kent Island subdivisions meet the State of Maryland's definition of a failed septic system.   Failed septic systems discharge untreated or undertreated sewage onto the surface or into groundwater polluting the ground and surface waters and increasing the risk of disease caused by human contact with bacteria and viruses in human fecal matter.   To address the public health problems presented by failing septic systems, the County seeks to extend municipal sewerage service to certain areas of South Kent Island.

The availability of funding has been a key factor in the County's ability to proceed with the construction of sewerage infrastructure.   Thus, the County has undertaken this program in cooperation with the State of Maryland by entering into a funding agreement in anticipation of a grant.   The State's Bay Restoration Fund, which awards grants to counties and municipalities for the purpose of connecting developed properties with failing septic systems to a wastewater treatment plant, was initially restricted to certain properties located within the State's "priority funding areas" ("PFA"). Md. Code Ann., Envir. § 9-1605.2 (West 2015).   This restriction on funding is premised on Maryland's Smart Growth Law, codified primarily in Md. Code Ann., State Finance and Procurement §§ 5-7B-01 et seq. (West 2015), which limits State funding for growth-related projects outside PFAs.

South Kent Island is located outside the State's PFA and, thus, was not eligible for State funding. In 2014, however, the Legislature amended Envir. § 9-1605.2(h)(5) in order to allow the MDE to subsidize a sewerage system that serves areas outside of a PFA if certain requirements were satisfied. The Legislature imposed two conditions that are relevant here: (1) it required a PFA exception under State Fin. & Proc. § 5-7B-06 (West 2015), which required approval of the Smart Growth Coordinating Committee ("SGCC"); and (2) it required a funding agreement to include provisions to ensure denial of access to future connections outside the service area. Envir. § 9-1605.2(h)(5)(iv)2 to (v). The funding agreement at the center of this dispute incorporated the restrictions required by this amendment.

To proceed with the construction of sewerage infrastructure, the County was required to reconcile its obligations under State law to serve certain properties with municipal sewer service once the line was constructed with the limitations on the availability of State funding to improve those properties. Specifically, stricter zoning and percolation requirements have resulted in numerous small and unimproved lots contiguous with improved lots with existing homes being barred from employing individual septic systems.[1] Under Maryland's Smart Growth Law, State funding is not

---

[1] The County imposed strict percolation requirements in the late 1980s, preventing residential improvement using septic systems on many of the undeveloped lots in South Kent Island. Moreover in 1987, the County enacted a zoning ordinance which included

available to serve new development, vacant lots, or other properties along the path of the sewerage system. State law, however, requires a county sanitary commission to provide services to abutting property owners with the "Service Area."[2]  Md. Code Ann., Envir. § 9-661.

The County and SGCC are also concerned with the potential overdevelopment caused by providing sewer service to existing, but currently unbuildable, vacant lots within the planned Service Area. (MDE's Mot. to Dismiss Count IV of the Complaint ["MDE's Motion"] Ex. 1, at 7-8, ECF No. 14-2).  The County is concerned that continued overdevelopment of the NC-20 District would negatively impact its ability to evacuate Kent Island in the event of an emergency and provide adequate roads, schools, and other public facilities to serve an increased population.  Id. at 8.  SGCC also found that restricting the number of lots eligible to receive sewer service was necessary because of the limited sewage capacity at the wastewater treatment plant.  Id. at 9.

To minimize development while also complying with the State's environmental and Smart Growth statutes, the County implemented several measures.  First, the County amended its comprehensive Water and Sewer Plan to exclude large blocks of contiguous vacant lots from the "Service Area" and to only include vacant lots

provisions prohibiting any property within the NC-20 District platted and recorded after 1987 from being used for residential development unless the lot size is 20,000 square feet or greater.

[2] The "Service Area" sets forth the geographical boundaries of an area to be provided with sewer service.

interspersed among existing homes.[3] Streets and blocks with only vacant lots along with fully undeveloped streets were generally excluded from the Service Area because the extension of service to those areas was deemed unnecessary to correct the existing public health problems created by failing septic systems and not financially justifiable or feasible in light of the limited resources available.

Second, the County reduced the number of potential vacant lots by passing Ordinance No. 13-24 (the "Grandfather/Merger Provision"), which essentially requires unimproved lots to merge with contiguous unimproved or improved lots that were under the same ownership on November 12, 2013, as needed to achieve conformity with the NC-20 District's 20,000-square foot minimum lot size requirement or to prevent leaving a contiguous substandard "orphan" lot that is under the same ownership. These two steps had the effect of reducing the number of vacant lots to receive municipal sewer service from approximately 1600 to 632. (MDE's Motion Ex. 2, at 6, ECF No. 14-3). Moreover, as a condition of funding and a requirement of the 2014 Legislative Amendment, the final funding agreement included a "Denied-Access Provision," which denies all future connections outside the project's proposed service area.

---

[3] Although the Complaint alleges that Resolution No. 14-07 creates the geographic boundaries of the Service Area, it merely imposes the benefit assessments within the Wastewater Subdistrict to help finance the sewer project.

Plaintiffs Kevin Quinn and Queen Anne Research and Development Corporation (collectively "Quinn") purchased no fewer than 232 lots on South Kent Island (the "Quinn Properties"), ranging in size from 5,000 to 70,200 square feet, between 1984 and 2002.  Each of the individual and separate lots provided an unrestricted right of access to a private beachfront on the Chesapeake Bay and certain Transferrable Development Rights under the local County Code.  At the time of acquisition, many of the lots were exempt from zoning restrictions and Quinn was entitled to develop and build residential housing on each of the individual lots irrespective of its area or frontage.  Further, the soil condition on most of the Quinn Properties satisfied the percolation testing requirements to permit residential development on a number of the properties.  Several years later, however, the percolation test requirements changed, forcing Quinn to wait on his development plans until municipal sewer service was available on South Kent Island.

Many of the lots constituting the Quinn Properties are contiguous and undeveloped such that they form a large tract of undeveloped land.  As a result, most of the Quinn Properties are excluded from the County's Service Area, even while many are contiguous to and surrounded by lots that are included.  Quinn contends that by drawing and approving a sewer service area that excludes his parcels, his parcels become permanently ineligible for sewer service, effectively rendering his lots undevelopable and denying him all economically viable use of his property.  He

alleges this government action constitutes an unconstitutional taking under the Fifth Amendment and a violation of his substantive and procedural due process rights under the Fourteenth Amendment.

Moreover, Quinn alleges the County's Grandfather/Merger Provision, forcing the merger of his separately recorded and platted lots as a condition to obtaining a building permit, unconstitutionally interferes with his distinct investment-backed expectations when he purchased each of the lots separately and individually. As the owner of the largest number of contiguous, non-conforming, and undeveloped lots in the Kentmorr subdivision of South Kent Island, Quinn alleges he has been disproportionately affected by the Ordinance which deprives him of all economically viable use of his land.

On November 11, 2014, Quinn filed a Complaint for declaratory and injunctive relief and damages alleging the County's Grandfather/Merger Provision and Water and Sewer Plan, separately and together, constitute: (1) a taking of his unimproved lots without just compensation in violation of the Fifth Amendment to the United States Constitution (Count I) and Article 24 of the Maryland Constitution (Count V) – (collectively the "Takings Claim"); (2) violations of equal protection under the Fourteenth Amendment to the United States Constitution (Count II) and Article 24 of the Maryland Constitution (Count VI) – (collectively the "Equal Protection Claim"); and (3) violations of substantive and procedural due process under the Fourteenth Amendment to the United

States Constitution (Count III).  Quinn also alleges the MDE acted in violation of his substantive and procedural due process under the Fourteenth Amendment to the United States Constitution (Count IV) by approving the 2011 Queen Anne's County comprehensive Water and Sewer Plan excluding his parcels.

## II. DISCUSSION

### A.    <u>Standards of Review</u>

A Federal Rule of Civil Procedure 12(b)(6) motion should be granted unless an adequately stated claim is "supported by showing any set of facts consistent with the allegations in the complaint." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 563 (2007); <u>see</u> Fed.R.Civ.P. 12(b)(6).  "'[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  <u>Presley v. City of Charlottesville</u>, 464 F.3d 480, 483 (4th Cir. 2006) (alterations omitted)(quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 555.  A complaint is also insufficient if it relies upon "'naked assertion[s]' devoid of 'further factual enhancement.'"  <u>Iqbal</u>, 556 U.S. at 678 (alteration in the original) (quoting <u>Twombly</u>, 550 U.S. at 557).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth "a claim for relief that is plausible on its face." Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 570.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 556.  "In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).

"When 'matters outside the pleading are presented to and not excluded by the court, the [12(b)(6)] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.'"[4]

---

[4] The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion. First, the "parties [must] be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment" and, second, "the parties [must] first be afforded a reasonable opportunity for discovery." Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt., 721 F.3d 264, 281 (4th Cir. 2013) (quoting Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985)).  The alternative caption of the County's Motion and the attached exhibits are sufficient indicia that the Motion might be treated as one for summary judgment. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005).
Once notified, "summary judgment is appropriate only after 'adequate time for discovery.'" Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  The failure to file an affidavit specifying legitimate needs for discovery "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir. 1995) (quoting Paddington Partners v. Bouchard, 34 F.3d

<u>Laughlin v. Metro. Wash. Airports Auth.</u>, 149 F.3d 253, 260-61 (4th Cir. 1998) (alteration in original) (quoting Fed.R.Civ.P. 12(b)). Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970)).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."  <u>Anderson</u>, 477 U.S. at 247-48 (alteration in original).

A "material fact" is one that might affect the outcome of a party's case.  <u>Id.</u> at 248; <u>see also</u> <u>JKC Holding Co. v. Wash. Sports Ventures, Inc.</u>, 264 F.3d 459, 465 (4th Cir. 2001) (citing <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001)).  Whether a fact is considered to be "material" is determined by the

---

1132, 1137 (2d Cir. 1994)).  Here, because Quinn has failed to specify a need for discovery, construing the County's Motion as one for summary judgment is appropriate.

substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.

**B.  Analysis**

**1.  Due Process Claims**

Quinn claims he was denied substantive due process by Defendants failure to extend sewer service to his parcels, which effectively has rendered his lots undevelopable and denied him all economically viable use of his property.  Because Queen Anne's County land-use regulations confer upon the Sanitary Commission and the MDE significant discretion to define the County's sewer Service Area, however, Quinn has failed to demonstrate a constitutionally protected property interest in public sewer access.

In considering any due process claim, the starting point is identifying a constitutionally protected property interest. Gardner v. City of Balt. Mayor & City Council, 969 F.2d 63, 68 (4th Cir. 1992); see also Frall Developers, Inc. v. Bd. of Cty. Comm'rs for Frederick Cty., No. CCB-07-2731, 2008 WL 4533910, at *8 (D.Md. Sept. 30, 2008) ("[T]he "starting point" for analyzing any procedural due process claim is to determine whether the plaintiff has a protected property interest 'sufficient to trigger federal due process guarantees.'" (quoting Scott v. Greenville Cty., 716 F.2d 1409, 1418 (4th Cir. 1983))).  Property interests under the Fourteenth Amendment "are created and their dimensions are defined

12

by existing rules or understandings that stem from an independent source such as state law . . . ." Id. (alteration in the original) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)). In Roth, the Supreme Court of the United States explained that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. at 577.

The Fourth Circuit applies Roth's "claim of entitlement" standard to municipal land-use decisions such as the one at issue here. Gardner, 969 F.2d at 68. Under this approach, any significant discretion conferred upon the Sanitary Commission and the MDE to define the County's sewer Service Area defeats Quinn's claim of a property interest in being included in the Service Area. See id. Thus, Quinn's interest in public sewer access-if he has any at all-is created and defined by Md. Code Ann., Envir. §§ 9-601 et seq.

Under Maryland law, a sanitary commission may create or alter individual service areas and service subareas within the district without any qualifying criteria, Md. Code Ann., Envir. §§ 9-647, 648, 652; and MDE may approve, disapprove, approve in part, or modify the proposal without any qualifying criteria, Md. Code Ann., Envir. § 9-507(a). Thus, Maryland's Environment Article confers significant discretion upon the Sanitary Commission and the MDE to define and approve the service areas within the county.

13

Nevertheless, Quinn argues that Md. Code Ann., Envir. § 9-661 creates an independent obligation by the Sanitary Commission to construct a connector to the property line of each parcel that abuts the sewer line. Thus, Quinn argues, Md. Code Ann., Envir. § 9-661 establishes a legitimate claim of entitlement to a sewer-line connector under State law. The obligation created by Envir. § 9-661, however, extends only to properties within the defined Service Area.

In isolation, Envir. § 9-661(a)(1) may be interpreted to require a connector for any abutting property; however, the sections of the statute must be read together to ascertain the true intention of the Legislature. See <u>Helvering v. N.Y. Trust Co.</u>, 292 U.S. 455, 464 (1934). Envir. § 9-666 gives the Sanitary Commission the discretion to extend a project to properties that are contiguous to a service area. Moreover, a sanitary commission's significant discretion to define service areas would be undermined if it were required to provide sewage service to every property that is either contiguous to a service area or that abuts interceptor lines transporting sewage from a designated service area to a treatment plant. Thus, the Court concludes that Md. Code Ann., Envir. § 9-661 does not create an "entitlement" to public sewer access. Accordingly, Quinn's due process claim fails as a matter of law.[5]

----

[5] Because Quinn has failed to demonstrate a constitutionally protected property interest, there is no need to reach the question

**2.   Takings Claim**

Quinn alleges the Grandfather/Merger Provision and the County's Water and Sewer Plan, separately and collectively, deprive him of all economically viable use of his property constituting an unconstitutional taking under the Fifth Amendment.

The Takings Clause of the Fifth Amendment does not bar the taking of private property, but rather requires compensation in the event an "otherwise proper interference [with private property] amount[s] to a taking." First English Evangelical Lutheran Church of Glendale v. L.A. Cty., Cal., 482 U.S. 304, 314–15 (1987); U.S. Const. Amend. V. Thus, to the extent Quinn does not seek compensation for a taking of his property, but rather an injunction against the enforcement of the County's regulatory scheme that Quinn alleges to be arbitrary and irrational, his claim sounds in due process and has been addressed above.  To the extent Quinn seeks declaratory relief, "property may be regulated to a certain extent, if regulation goes too far[, however,] it will be recognized as a taking." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005) (quoting Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922)).

Regulations that deny a property owner all "economically viable use of his land" constitute one of the discrete categories of regulatory deprivations that require compensation without the

of whether excluding his properties from the County's Water and Sewer Plan was arbitrary or capricious.  See Gardner, 969 F.2d at 68.

usual case-specific inquiry into the public interest advanced in support of the restraint. <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1015 (1992). In <u>Lucas</u>, the Supreme Court held that where a regulation completely deprives a property owner of all economically beneficial use, the government must pay compensation "except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." <u>Id.</u> at 1004.

First, Quinn contends that because the Grandfather/Merger Provision independently prohibits a residential dwelling from being built upon an individual non-conforming lot, no market exists for the sale of his individual non-conforming lots; therein wholly depriving him of the value of each individual non-conforming lot including the value of each individual lot's unrestricted right of access to the private beachfront and certain Transferrable Development Rights. The Grandfather/Merger Provision, however, does not deprive Quinn of all economically viable use of his property. The Grandfather/Merger Provision merely merges the individual lots to form a larger residential lot.  While the challenged action does cause some economic harm associated with the loss of individual unrestricted rights of access to the private beachfront and certain Transferrable Development Rights of each individual lot,[6] the Court finds that the lots are not stripped of all

---

[6] <u>See</u> discussion <u>infra</u> (addressing Quinn's Taking Claim with respect to the diminished value of his property).

beneficial use because they are simply developable as larger residential lots.

Next, Quinn contends that collectively the County's Water and Sewer Plan and the Grandfather/Merger Provision deprives him of all economically viable use of his property because the regulatory scheme permanently denies him sewer service, which effectively renders his merger lots undevelopable. "Where the State seeks to sustain regulation that deprives land of all economically beneficial use" without compensation, Lucas, 505 U.S. at 1027, the limitation "must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership," id. at 1029.

Here, Quinn has not demonstrated that his exclusion from the County's Water and Sewer Plan is the proximate cause of his lots being undevelopable. In fact, Quinn concedes that the implementation of stricter percolation test requirements left his lots undevelopable until the possibility of sewer service came to fruition. (Quinn Aff. ¶5, ECF No. 17-1). Quinn never gained eligibility for municipal sewer access and has alleged no facts to support a legitimate expectation that his undeveloped parcels would ever be eligible for municipal sewer service. Indeed, inherent in the title when Quinn invested in his properties on South Kent Island was the implied limitation that he would have to provide his own water and sanitary waste disposal. All developed properties on South Kent Island are currently, and have always been, serviced by

17

septic tanks and the County does not provide municipal sewer service to any property. (Quinn Aff. ¶13).

Further, while Quinn contends that the Sanitary Commission adopted a 2006 Water Service Area for South Kent Island that outlines areas that were expected to receive sewer service in the future, he does not allege that his properties were included in the 2006 geographic Service Area. (See Quinn Aff. ¶14). Even assuming his properties were identified in 2006 for potential future sewer service, Quinn purchased his properties between 1984 and 2002. (See Quinn Aff. ¶5); (see also Compl. ¶ 9). Quinn, therefore, has failed to allege his investment was backed by any legitimate expectation that his parcels would be provided with public sewer service.

Moreover, even assuming Quinn's lots were ever included in the County's Water and Sewer Plan, eligibility for a sewer connector does not necessarily guarantee a right to sewer service. Other lawful restrictions may result in the further denial of service. See Neifert v. Dep't of Env't, 910 A.2d 1100, 1119 (Md. 2006) (finding, under facts very similar to those in the instant dispute, that the denials of plaintiffs' sewer permits did not constitute a taking because they fell within the nuisance exception recognized by the Supreme Court in Lucas).

To the extent the challenged action does diminish the value of Quinn's property with respect to the loss associated with the unrestricted rights of access to the private beachfront and certain

18

Transferrable Development Rights of each individual lot, "regulatory takings challenges are governed by the standards set forth in <u>Penn Cent. Transp. Co. v. N.Y. City</u>, 438 U.S. 104 (1978). <u>Lingle</u>, 544 U.S. at 538 (explaining that outside of the discrete category of regulatory deprivation governed by <u>Lucas</u>, <u>Penn Central</u> analysis applies).

Although the Court in <u>Penn Central</u> did not develop a set formula for evaluating regulatory takings claims, it identified several factors of particular significance. <u>Penn Cent. Transp. Co.</u>, 438 U.S. at 124. Among those factors are the economic impacts of the regulation, particularly to the extent the regulation interferes with the claimant's distinct investment-back expectations, and the character of the governmental action. <u>Id.</u> A "taking," however, is less likely to be found when interference with property "arises from some public program adjusting the benefits and burdens of economic life to promote the common good." <u>Id.</u> Indeed, zoning laws are the classic example of permissible governmental action even where they prohibit "a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm." <u>Id.</u> at 125.

Here, the Court finds that the County's Grandfather/Merger Provision is substantially related to the promotion of the general welfare by (1) regulating land use to reduce the impact of overdevelopment on the environment and limited municipal facilities; and (2) achieving minimum lot sizes consistent with

modern land use principles and necessary to maximize its limited financial resources in addressing the public health crisis facing the fully-developed and partially-developed areas of South Kent Island with failing septic tanks. "[W]here the public interest is involved[,] preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property." Miller v. Schoene, 276 U.S. 272, 279-80 (1928). Accordingly, the Court concludes that the Grandfather/Merger Provision and the County's Water and Sewer Plan, separately[7] and collectively, do not constitute an unconstitutional taking as a matter law.

### 3. Equal Protection Claim

Quinn generally alleges that the geographical boundaries of the Service Area and the Grandfather/Merger Provision are targeted measures undertaken by the County Commissioners to prevent him from developing his property. Quinn contends that because he owns a majority of the contiguous, nonconforming, and undeveloped lots in

---

[7] The Court will not consider whether exclusion from the County's Water and Sewer Plan constitutes a taking independent of the Grandfather/Merger Provision because the Court has already concluded that Quinn has failed to demonstrate a constitutionally protected property interest in public sewer access. See Frall Developers, Inc. v. Bd. of Cty. Comm'rs for Frederick Cty., No. CCB-07-2731, 2008 WL 4533910, at *8 (D.Md. Sept. 30, 2008) ("To make a successful claim under the Takings Clause, a plaintiff must establish that it possesses a constitutionally protected property interest before the court will examine whether governmental use or regulation of that property constitutes a taking." (citing Washlefske v. Winston, 234 F.3d 179, 184–86 (4th Cir. 2000))).

the Kentmorr subdivision of South Kent Island, the Grandfather/Merger Provision will disproportionately deprive him of a significant number of his lots previously eligible for residential building. He further alleges the boundaries of the Service Area are arbitrarily defined in a manner that disproportionately affects his property and excludes them from the geographical area that would be served with public sewer access, although it provides for sewer service to properties contiguous with and adjacent to his. Quinn, however, has failed to allege any facts demonstrating that he is being treated differently than similarly-situated property owners and demonstrate either the County's decision to exclude large tracts of undeveloped land from its Water and Sewer Plan or the Grandfather/Merger Provision are not rationally related to a legitimate state interest.

The Fourteenth Amendment's Equal Protection Clause prohibits state action that denies a person equal protection "through the enactment, administration, or enforcement of its laws and regulations." Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995). The Supreme Court of the United States has also recognized an equal protection claim as a "class of one" where a plaintiff alleges it has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Tri Cty. Paving, Inc. v. Ashe Cty., 281 F.3d 430, 439 (4th Cir. 2002) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).

21

The County argues that Quinn has failed to allege he has been treated differently because other owners of undeveloped lots are subject to both the Grandfather/Merger Provision and have been excluded from the Service Area. Indeed, the Grandfather/Merger Provision is a zoning ordinance of general application and applies to all unimproved lots in the NC-20 District. Additionally, at least thirty-nine similarly-situated properties on South Kent Island have been excluded from the Service Area. Moreover, not all of Quinn's Properties have been excluded from the Service Area. Thus, Quinn has failed to allege any facts demonstrating that he is being treated differently than similarly-situated property owners.

Even assuming Quinn did allege sufficient facts demonstrating that he is being treated differently than similarly-situated property owners, he has failed to allege facts sufficient to demonstrate that such differential treatment resulted from purposeful discrimination under the "class of one" theory.[8] Quinn, therefore, has failed to state a claim for relief under the traditional[9] or "class of one" equal protection analysis.

---

[8] While Quinn argues <u>Olech</u> merely requires a showing of differential treatment, <u>Olech</u> actually requires a showing that differential treatment resulted from purposeful discrimination. <u>Olech</u>, 528 U.S. at 564-65 (requiring factual allegations showing an element of "subjective ill will" to state a claim for relief under a "class of one" equal protection analysis).

[9] Under the traditional equal protection analysis, "[t]o prove that a statute has been administered or enforced discriminatorily, more must be shown than the fact that a benefit was denied to one person while conferred on another. A violation is established only if the plaintiff can prove that the state <u>intended</u> to

Additionally, "[o]rdinarily, when a state regulation or policy is challenged under the Equal Protection Clause, unless it involves a fundamental right or a suspect class, it is presumed to be valid and will be sustained 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" Veney v. Wyche, 293 F.3d 726, 731 (4th Cir. 2002) (quoting Heller v. Doe, 509 U.S. 312, 319–20 (1993)). Here, neither a "fundamental right" nor a "suspect" classification is at issue. Rather, Quinn alleges the Grandfather/Merger Provision and the geographical boundaries of the Service Area, separately and collectively, disproportionately targeted and arbitrarily affected his property.

Regardless of the actual motivation for the County's action, "the pertinent question for determining whether the governmental action violated the Equal Protection Clause is whether [County] officials reasonably could have believed that the action was rationally related to a legitimate governmental interest." Front Royal & Warren Cty. Indus. Park Corp. v. Town of Front Royal, Va., 135 F.3d 275, 290 (4th Cir. 1998); see also id. (setting aside actual motivation for an objectively-reasonable analysis).

It is undisputed that the County has a legitimate state interest in preserving and enhancing the public health, safety, and

---

discriminate." Sylvia Dev. Corp., 48 F.3d at 819 (emphasis in the original) (citation omitted).

welfare of fully-developed and partially-developed areas of South Kent Island with failing septic tanks.  To ensure that it devised a regulatory scheme in accordance with State law, the County sought the advice of the Attorney General of Maryland (the "Attorney General") concerning the law governing the County's extension of sewerage service.  See generally 90 Op. Att'y 60 (April 13, 2005).

The Attorney General concluded that under State law, the County is required to provide a sewer "connector for each vacant lot within a service area that is interspersed among developed lots along a right-of-way in which the sewer line is laid." Id. at 61. If it is feasible to design a sewer system without including a street with vacant lots, however, the County is not obligated to provide service to that street.  Id.  Further, the County is not required to provide sewerage service outside the defined service area.  Id. at 62.

Because the availability of funding has been a key factor in the County's ability to address the public health problems presented by the failing septic systems, it entered into a funding agreement in anticipation of a grant from the State.  Under Maryland's Smart Growth Law, however, State funding is not available to serve new development, vacant lots, or other properties along the path of the sewerage system.  Thus, the State's funding restrictions, combined with the County's interest in reducing the impact of overdevelopment, required it to devise a

regulatory scheme that limited the eligibility of sewer service to a minimum number of lots.

The Court concludes the County reasonably believed that both its Water and Sewer Plan and the Grandfather/Merger Provision, separately and collectively, were rationally related to its obligations under State law to serve certain properties with municipal sewer service while establishing a mechanism for financing a waste disposal service appropriate for the conditions on South Kent Island.   Moreover, the County has an independent legitimate governmental interest in regulating land use to reduce the impact of overdevelopment on the environment and limited public facilities.   The Court concludes the County reasonably believed that the Grandfather/Merger Provision advances that interest by achieving minimum lot sizes consistent with modern land use principles.   Accordingly, Quinn's Equal Protection Claim fails as a matter of law.

### III. CONCLUSION

For the reasons given above, the County's Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 13) and the MDE's Motion to Dismiss Count IV of the Complaint (ECF No. 14) are GRANTED.   A separate Order will follow.

Entered this 13th day of August, 2015

/s/

_____
George L. Russell, III
United States District Judge